A93A0937. CLARK v. THE STATE.
A93A0938. DANIEL v. THE STATE.
(432 SE2d 220)

BLACKBURN, Judge.
Appellants were jointly indicted with the offenses of trafficking in cocaine, possession of less than one ounce of marijuana and possession of a firearm during the commission of a felony. After evidentiary hearings, appellants' motions to suppress were denied by the Bibb County trial court. Appellants' applications for interlocutory appeal were granted. On appeal, both appellants contend that the trial court erred in denying their motions to suppress. We agree, as this was clearly a pretextual stop of a rental vehicle and a constitutionally impermissible search of appellant Clark, a black man, neither of which this court will condone.

On August 30, 1992, at about 10:40 p.m., Sergeant Boney, a Macon city police officer assigned to the Macon Drug Interdiction Unit, a special drug unit consisting of Sergeant Boney, another unit, and a dog unit, entered I-75 traveling north. Unrelated to any criminal in-

vestigation Sergeant Boney had previously contacted the auto leasing agencies in the Macon area concerning the disposition of vehicles involved in drug stops. Sergeant Boney noticed that a 1992 Ford Thunderbird, approximately 300 feet in front of his vehicle traveling north in the right lane, merged onto the Mercer University Boulevard exit ramp without the use of a turn signal at a point where I-75 curves sharply to the left and the defendant simply continued straight ahead in the right-hand lane. No other vehicles were traveling northbound on I-75 within sight of Sergeant Boney and the Thunderbird. Sergeant Boney followed the Thunderbird onto the exit ramp and increased his speed in order to close the distance between himself and the Thunderbird. Sergeant Boney also observed that the defendant was driving a leased vehicle and decided to stop the Thunderbird, purportedly to "investigate" the improper lane change violation, which had just occurred in his view and was a completed act.

1. Both appellants assert that Sergeant Boney's stop of the Thunderbird was made without a valid independent reason and, therefore, was pretextual. Appellants base their contention on the wording of OCGA § 40-6-123 and argue that it does not require the use of a turn signal in the present circumstances. The statute provides, in pertinent part: "(a) No person shall . . . turn a vehicle from a direct course or change lanes or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate and timely signal in the manner provided in this Code section. (b) A signal of intention to turn right or left or change lanes *when required* shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction." (Emphasis supplied.)

The trial court determined that a violation of OCGA § 40-6-123 had occurred because the driver of the Thunderbird failed to give a turn signal when exiting. This determination was erroneous. It is clear from the face of the statute that the legislature anticipated occasions when a signal was not required.[1] A lane change must be made with "reasonable safety" and, in some instances, reasonable safety requires giving a turn signal. OCGA § 40-6-123 (a). Subsection (b) sets forth the manner and purpose of signaling one's intention to change lanes at times when such a signal is required. The legislature's concern was plainly the preservation of the safety of others by requiring sufficient notice of the driver's intent to turn or change lanes. Their use of the

---

[1] The court must construe statutes according to their terms when the plain language is susceptible of but one natural and reasonable construction. *State Farm Mut. Auto. Ins. Co. v. Ainsworth*, 198 Ga. App. 740 (402 SE2d 759) (1991).

terms "when required" in subsection (b), clearly indicates that they anticipated times when use of a signal was not required for the safety of others. There is no question that the facts before us present such a situation.

The Mercer University Boulevard exit ramp begins where I-75 curves to the left, thereby enabling a car to enter the exit ramp with only a minor shift to the right. This type of interstate exit ramp is designed to emerge from the outside traffic lane and allows vehicles to enter safely from that lane without the use of a turn signal when no other vehicles are in the area. This situation is different from one in which a vehicle is changing lanes on an interstate, rather than entering an exit ramp, or when traveling on a road or street other than an interstate. It was undisputed that no other vehicles were in the vicinity of the Thunderbird. Additionally, Sergeant Boney was far enough away that he would have been unable to see any hand signal, if given, as authorized by OCGA § 40-6-124 (a).

Sergeant Boney admitted that the action of the Thunderbird did not endanger the safety of anyone and that he had to speed up in order catch the Thunderbird on the long exit ramp. He also admitted that the Thunderbird was traveling within the speed limit and did not weave upon the roadway or exit ramp. However, Sergeant Boney further testified that although he had pulled hundreds of vehicles over for such a violation, he had issued very few tickets for this offense. Sergeant Boney was aware that a license plate containing four numbers followed by a letter, as secured to the bumper of the Thunderbird, usually indicated a rental vehicle. Under the present facts, notice of intent to change lanes was not necessary.

The state argues that the present stop is no different than the one upheld by this court in *Huff v. State*, 205 Ga. App. 557 (422 SE2d 664) (1992). We disagree. In *Huff*, the officer saw the "defendant weave across the lines bounding defendant's lane on two occasions." Id. at 557. Thereafter, when the officer "pulled behind defendant's automobile to stop him for the traffic violation, defendant moved to another lane without signalling before pulling off the road. The officer testified he habitually pulled over the drivers of vehicles he observed weaving on the roads because often it was an indication the driver was under the influence of alcohol or falling asleep at the wheel." Id. It is clear from the opinion in *Huff* that the officer pulled the defendant over due to the car's weaving. Furthermore, the officer in *Huff* was directly behind the defendant when the defendant changed lanes without a turn signal. In the case sub judice, Sergeant Boney was approximately 300 feet behind the Thunderbird when it merged onto the exit ramp and no other vehicles were in the vicinity.

The trial court ruled that the violation of OCGA § 40-6-123 gave Sergeant Boney an "independent valid reason" to stop the Thunder-

bird. However, because this court finds that OCGA § 40-6-123 was not violated, Sergeant Boney's stop of the Thunderbird was invalid unless supported by specific and articulable facts sufficient to give rise to a reasonable suspicion that the occupants of the Thunderbird were, or were about to be, engaged in criminal activity. *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 20 LE2d 889) (1968); *Evans v. State*, 183 Ga. App. 436 (2) (359 SE2d 174) (1987). " 'Investigative stops of vehicles are analogous to *Terry*-stops, *Terry*, supra, and are invalid if based upon only "unparticularized suspicion or 'hunch,' " 392 U. S. at 27 (88 SC at 1883, 20 LE2d at 909).' [Cit.]" *Evans*, 183 Ga. App. at 438.

In the case sub judice, Sergeant Boney admitted that he observed no violations other than the alleged improper lane change. He also admitted that the Thunderbird was traveling at the posted speed limit and that it did not weave. The only other fact of which Sergeant Boney was aware prior to the stop was that the car was a rental car. The court is required to look "to what a reasonable officer *would* do rather than to what an officer validly *could* do. . . ." (Citation and punctuation omitted.) *Tarwid v. State*, 184 Ga. App. 853, 855 (363 SE2d 63) (1987). " 'If officers were permitted to conduct *Terry*-stops based on what conceivably could give rise to reasonable suspicion of minor violations, the necessary connection between a seizure's justification and its scope would inevitably unravel. [Cit.]' " Id. The facts before us do not create any basis for a reasonable suspicion of criminal conduct, therefore, Sergeant Boney's stop of the Thunderbird cannot be upheld.

2. Because of our holding in Division 1, supra, it is unnecessary for us to consider appellants' additional grounds for reversing the denial of their motions to suppress. However, assuming arguendo that Sergeant Boney did conduct a valid stop of the Thunderbird, this court finds that Sergeant Boney's search of the driver, appellant Clark, exceeded the permissible scope of *Terry*, supra. The trial court ruled that Sergeant Boney, after he stopped the Thunderbird, conducted a valid *Terry*-type stop and frisk of Clark. When Sergeant Boney turned on his blue lights, a video camera was activated which recorded the search and arrest of Clark. This court has reviewed the tape recording in its entirety and finds that Sergeant Boney's search of Clark was unlawful.

The recording revealed that Clark exited the vehicle upon Sergeant Boney's request. In response to Sergeant Boney's request for a driver's license, Clark produced a traffic citation, which substituted for his driver's license and authorized him to drive. Upon Sergeant Boney's request for the rental agreement, Clark walked to the passenger side of the Thunderbird and reached in to retrieve it. After reviewing the rental agreement, Sergeant Boney concluded that it

showed that the car was rented in the name of Tim Britt and that no other drivers were listed as authorized. Sergeant Boney told Clark not to put his hands in his pockets. Clark immediately obeyed and folded his arms across his chest.

Thereafter, backup units arrived on the scene. Sergeant Boney then asked Clark, "You don't have any weapons on you, do you?" Simultaneously, Sergeant Boney shined his flashlight on the front pockets of Clark's shorts. Clark's shorts were partially covered by his T-shirt, but a large bulge in his shorts' pocket was apparent. Sergeant Boney reached over and squeezed the bulge in Clark's pocket. Upon questioning, Clark responded that the bulge was money. Sergeant Boney admitted that the bulge felt like money; however, he instructed Clark to remove it from his pocket and place it on the hood of the car. Clark immediately complied. Sergeant Boney continued to grab at and feel the contents of the pockets to Clark's shorts, which now appeared flat. Sergeant Boney then put his hand into Clark's right front pocket and removed cigarette rolling papers. Sergeant Boney then reached into Clark's left front pocket, the pocket from which Clark had removed the money, and removed what appeared to be two marijuana cigarettes. Sergeant Boney then arrested Clark for possession of marijuana.

An officer who has lawfully detained a citizen must have and be able to articulate a reasonable belief that the person is armed and presents a danger in order to be authorized to conduct a pat-down of the person for weapons. *Terry*, 392 U. S. at 24; *Brown v. State*, 181 Ga. App. 768 (353 SE2d 572) (1987). This court agrees with the trial court that Sergeant Boney was authorized to conduct a pat-down search; however, this court finds that Sergeant Boney's conduct of putting his hand inside Clark's pockets went beyond the permissible scope of a pat-down search.

"A frisk involves the patting-down of a person's outer clothing by a police officer. Unlike a full search, a frisk is conducted solely for the purpose of insuring the safety of the officer and of others nearby, not to procure evidence for use at a subsequent trial. . . . [I]t must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer. In other words, an extended search, exceeding the purpose of the frisk, would be constitutionally unreasonable, and any evidence thereby obtained must be excluded. In *Terry v. Ohio*, supra, the court's emphasis upon the procedures followed by the officer indicates that a two-step process must ordinarily be followed: (1) The officer must pat down first, and (2) then intrude beneath the surface only if he comes upon something which feels like a weapon. . . . An officer who exceeds a pat-down without first discovering an object which feels reasonably like a knife, gun, or club must be able to point

to specific and articulable facts which reasonably support a suspicion that the particular suspect is armed with an atypical weapon which would feel like the object felt during the pat-down." (Citations and punctuation omitted.) *Brown v. State*, 181 Ga. App. at 770-771.

The record herein is completely devoid of testimony or facts showing that Sergeant Boney found something that felt like a weapon before he intruded into the pockets of Clark's shorts, after Clark had already removed the bulge caused by a large sum of money. Such an intrusion, which revealed only cigarette rolling papers and two marijuana cigarettes was not supported by a reasonable suspicion that these items were some atypical weapon. "Since the weapons search was not conducted within constitutionally permissible bounds, the seizure of the drugs cannot be justified on this basis." (Citations and punctuation omitted.) Id.

3. Based upon this court's findings above, the remaining contentions argued by appellants need not be reached.

*Judgment reversed. McMurray, P. J., and Johnson, J., concur in the judgment only.*

DECIDED MAY 19, 1993 —
RECONSIDERATION DENIED JUNE 9, 1993 ▮▮▮▮▮▮▮

*Steven T. Maples,* for appellant (case no. A93A0937).

*Brown, Katz, Flatau & Hasty, Fred M. Hasty, Franklin J. Hogue,* for appellant (case no. A93A0938).

*Willis B. Sparks III, District Attorney, Vernon R. Beinke, Thomas J. Matthews, Assistant District Attorneys,* for appellee.