### A99A2046. PETERS v. THE STATE.
(531 SE2d 386)

BARNES, Judge.

Carlos Peters appeals from his conviction of possessing cocaine with the intent to distribute it. In this appeal, Peters argues (1) the trial court erred by denying his motion to suppress; (2) insufficient evidence supports his conviction; and (3) the trial court erred when it recharged the jury without notifying him or his counsel. For reasons that follow, we reverse.

The evidence presented during the motion to suppress hearing, and at trial,[1] showed that two armed and uniformed DeKalb County police officers prevented Peters from getting into his car and leaving an apartment complex because they "observed a black male, the defendant, come out of a breezeway in a hurried fashion." The officers testified that the breezeway from which Peters exited was known for heavy drug sales. When Peters saw the officers, he became very nervous and continued to hurry out of the complex toward his car. After stopping Peters and asking him for identification, Officer West reached into Peters' pants and removed a "three to four-inch cookie-sized chunk" of crack cocaine and two bags of marijuana.

1. In his first enumeration of error, Peters asserts the trial court should have granted his motion to suppress because the officers did not have the articulable suspicion necessary to detain him.

> [United States] Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of

---

[11] See *Sigmon,* supra at 50-51; *Luckey,* supra at 433.
[1] When reviewing a trial court's ruling on a motion to suppress, we may consider trial testimony in addition to the testimony submitted during the motion to suppress hearing. *Sanders v. State,* 235 Ga. 425, 431-432 (2) (219 SE2d 768) (1975).

the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.

(Citations and punctuation omitted.) *McAdoo v. State*, 164 Ga. App. 23, 26 (1) (295 SE2d 114) (1982).

> In the first [tier], police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. The second tier occurs when the officer actually conducts a brief investigative *Terry* stop of the citizen. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity.

(Citations and punctuation omitted.) *McClain v. State*, 226 Ga. App. 714, 716 (1) (487 SE2d 471) (1997).

In order to address Peters' first enumeration of error, we must first determine whether the initial contact between the officers and Peters should be categorized as a first- or a second-tier encounter. Because the officers verbally commanded Peters to stop and prevented him from entering his automobile, we find that it was a second-tier encounter for which a reasonable, articulable suspicion of criminal activity was required. See *State v. Blair*, 239 Ga. App. 340 (521 SE2d 380) (1999).

In this case, the officers lacked the requisite suspicion. Peters did not flee from a high drug sale area at the sight of the officers. Compare *Illinois v. Wardlow*, 528 U. S. 119 (120 SC 673, 145 LE2d 570, 575) (2000) (defendant "looked in the direction of the officers and fled"); *Harris v. State*, 205 Ga. App. 813, 814 (1) (423 SE2d 723) (1992) (when defendant and others "saw the patrol car, they began running"). Instead, Peters continued hurrying toward his car, just as he was before he spotted the officers. See *State v. Winnie*, 242 Ga. App. 228 (529 SE2d 215) (2000). Appearing nervous in the presence of police officers also falls short of the reasonable, articulable suspicion required by *Terry*. See *Holt v. State*, 227 Ga. App. 46, 50 (487 SE2d 629) (1997).

Since the officers stopped Peters without a reasonable, articulable suspicion that he was engaged or about to engage in criminal activity, the trial court erred when it denied his motion to suppress evidence seized as a result of this unlawful stop and seizure of his person.

2. Based on our holding in Division 1, Peters' remaining enumerations of error are moot.

*Judgment reversed. Blackburn, P. J., and Eldridge, J., concur fully and specially.*

ELDRIDGE, Judge, concurring specially.

I concur fully in the majority opinion and write only to make clear certain, specific facts of this case.

1. The record regarding the stop is quite clear. It is uncontroverted that Officers West and Waltower verbally ordered Peters to stop and, after he obeyed their command, the officers approached Peters for questioning. The officers did so *solely* because Peters was "hurrying" away from a known drug sale location. Peters appeared "nervous" to the officers only *after* he had already been stopped as shown by the following testimony first from the suppression hearing:

> [Officer Waltower:] We observed a black male, the defendant, come out of a breezeway in a hurried fashion. . . . He was basically coming in our direction towards a yellow vehicle in a hurried fashion. When he saw us, he became very nervous. . . . When he saw us, he came almost to a complete stop and began looking around as if he was looking for an escape avenue. . . . He was stopped by myself and Officer West. . . . He was stopped with a verbal command. . . . [He] [d]id obey . . . our verbal commands to stop. . . . He was in the parking lot near his vehicle. . . .
> [Q:] Was he doing anything else that was suspicious?
> [Waltower:] When he was stopped, sir, he became very nervous.
> [Q:] When he was stopped?
> [Waltower:] Yes, sir.

and also from the trial:

> [Officer Waltower:] [W]e observed a black male, later identified as Carlos Peters, was coming up from one of the lower levels in the breezeway in a hurried fashion, going towards a yellow Buick Regal, I believe it was. . . . We stopped Mr. Peters. He seemed to be quite nervous *when* we stopped him. I believe Officer West questioned him as to what he was doing. . . . (Emphasis supplied.)
> [Officer West:] [W]e walked around Building 2801, we observed Mr. Peters run from a breezeway where drugs is heavily sold. . . . He was hastily walking towards his car. . . . Based on him running from the breezeway, I attempted to stop him to identify him.

That Peters may have appeared "nervous" or looked like he wanted an "escape avenue" when he was stopped cannot, after the fact, supply reasonable articulable suspicion to do what the officers had already done. Hurrying to one's automobile — even in a known drug sale location — is not, alone, sufficient to erode the people's constitutional right against unreasonable government intrusion. See, e.g., *Hughes v. State*, 269 Ga. 258, 260 (497 SE2d 790) (1998). Unsupported by any reasonable articulable suspicion that Peters was engaging or about to engage in criminal activity, the stop was an unconstitutional detention.

2. Even if the officers had been able to articulate a reasonable suspicion to justify a second-tier *Terry* stop of Peters, the subsequent search was bad. *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). There were no exigent circumstances which would permit the officers to abandon a *Terry* protective pat-down, reach into the compliant suspect's pants, and remove a paper towel to see what is in it.

> In *Terry v. Ohio*, supra, the court's emphasis upon the procedures followed by the officer indicates that a two-step process must ordinarily be followed: (1) The officer must pat down first, and (2) then intrude beneath the surface only if he comes upon something which feels like a weapon.

*Clark v. State*, 208 Ga. App. 896, 900 (432 SE2d 220) (1993). "More invasive procedures have been approved where an officer has had a reasonable basis for concluding that a suspect was armed or was otherwise a threat to his personal safety. See *Hayes v. State*, 202 Ga. App. 204 (414 SE2d 321) (1991)." *State v. Newton*, 227 Ga. App. 394, 396 (1) (489 SE2d 147) (1997). But implicit in this holding is that the officer concluded that the suspect was armed or was otherwise a threat to his personal safety and can articulate a basis for his conclusion so that a *Terry* protective pat-down would not be unreasonable under the circumstances. *Hayes v. State*, supra at 206-207. Here, the officers never testified that they concluded Peters was armed and dangerous.

In fact, Officer West (who conducted the search) testified that he felt "suspicion" because Peters appeared to be concealing something behind his right hand. So, West turned Peters around and moved the offending hand. Peters was compliant and nonthreatening throughout these maneuvers. Clearly, after West moved Peters' hand, nothing was then being concealed.

However, after West moved Peters' hand, West saw a "bulge": "His hand over his waistline. When I removed the hand, that is when I noticed the bulge in his waistline." West testified that he had no idea what the "bulge" was and that he "didn't draw any conclusions."

The "bulge," itself, was a white paper towel wrapped around a three-to four-inch chunk of crack cocaine and two small baggies containing less than an ounce of marijuana in total. Neither West nor Waltower testified that they thought the "bulge" looked like a weapon. Nor did they know Peters or have reason to suspect him, specifically, to be armed. Officer West provided no explanation for not patting down Peters before he "removed his hand from his waistline, pulled the pants back[,] observed the bulge," and "reached" for it. Officer West may have recited the litany that he checked Peters for "my safety to check for a weapon," but, at the same time, he stated that he also checked him "for whatever else he was concealing"; West provided no evidence to demonstrate that the *Terry* pat-down was dispensed with because West's safety was in jeopardy or might be if he did not immediately, prior to a protective pat-down, remove the white paper towel he discovered when he looked in Peters' pants.[2]

While officer safety is of paramount importance, an officer must provide some evidence to show that an act performed under the aegis of "for my safety" is actually for such purpose and either follows the constitutional guidelines of *Terry* or has an appropriate basis for a departure therefrom. Absent any testimony that the "officer . . . had a reasonable basis for concluding that [Peters] was armed or was otherwise a threat to his personal safety," *State v. Newton*, supra at 396, so as to avoid the constitutional requirements of *Terry*, the search of Peters was unconstitutional.

I am authorized to state that Presiding Judge Blackburn joins in this concurrence.

DECIDED MARCH 16, 2000.

*Gerard B. Kleinrock*, for appellant.

*J. Tom Morgan, District Attorney, Maria Murcier-Ashley, Thomas S. Clegg, Assistant District Attorneys*, for appellee.

---

[2] Clearly, if a *Terry* protective pat-down had been conducted and the officer had felt an object whose contour or mass made its identity immediately apparent, there would have been no invasion of Peters' privacy beyond that already authorized by the officer's search for weapons. Under this "plain feel" exception, the warrantless seizure of the object in Peters' clothing would be justified by the same practical considerations that inhere in the plain-view context. Of course, such concept has no application here, since a protective pat-down was not performed and the officer testified that he had no idea what the object was before he reached into Peters' waistband to retrieve it. *Tukes v. State*, 236 Ga. App. 77, 79 (511 SE2d 534) (1999); *State v. Dills*, 237 Ga. App. 165, 168 (514 SE2d 917) (1999).